VILLANTI, Judge,
Dissenting.
I respectfully dissent because I do not agree that the trial court erred in its jury instruction regarding section 627.7073.
The standard of review applicable to a trial court’s decision to give or withhold a jury instruction is abuse of discretion. Barbour v. Brinker Fla., Inc., 801 So.2d 953, 959 (Fla. 5th DCA 2001). “Trial courts are generally accorded broad discretion in formulating jury instructions.” Id.; see also Barkett v. Gomez, 908 So.2d 1084, 1086 (Fla. 3d DCA 2005) (noting that decisions regarding jury instructions rest within the trial court’s discretion and will not be reversed absent a showing of prejudicial error). In this case, the statute stated that the findings, opinions, and recommendations of the experts were presumed correct. See § 627.7073(l)(c). I fail to see how a trial court can abuse its discretion by giving an instruction that merely tracks the governing law. In fact, it would have been an abuse of discretion for the trial court to deny giving the requested instruction, since it was undisputed that Universal met its obligations under the new legislation and that Mr. Warfel’s claim both arose and was filed after the statute’s effective date. See, e.g., Barkett, 908 So.2d at 1086-87 (holding that failure to give jury instruction which tracked statutory language and which was warranted by the evidence or arguments required a new trial).
*141 Furthermore, the parties do not dispute that social policy concerns drove the legislative changes at play in this case. They only disagree as to whether the presumption that accompanied these changes was one shifting the burden of proof or one that merely vanished once countervailing evidence was adduced. I contend that because the statutory sections at issue in the case were enacted to advance social or public policy, a burden-shifting presumption applies.
Section 90.303, Florida Statutes (2005), provides:
Presumption affecting the burden of producing evidence defined. — In a civil action or proceeding, unless otherwise provided by statute, a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy, is a presumption affecting the burden of producing evidence.
(Emphasis added.) Section 90.304 then provides:
Presumption affecting the burden of proof defined. — In civil actions, all re-buttable presumptions which are not defined in s. 90.303 are presumptions affecting the burden of proof.
(Emphasis added.) Section 90.304 applies to presumptions implementing public policy and, therefore, applies in this case.
Caldwell v. Division of Retirement, Florida Department of Administration, 372 So.2d 438, 439 (Fla.1979), provides a useful analytic framework. In Caldivell the supreme court analyzed presumptions where the relevant statute did not expressly create a burden-shifting presumption. The ease involved section 112.18(1), Florida Statutes (1975), which provided that a fireman’s disability or death caused by heart disease was presumed to have been suffered in the line of duty unless the contrary was shown by competent evidence. Id. In Caldwell, there was conflicting expert testimony as to the cause of the fireman’s injury. Id. The supreme court concluded that the presumption created by the statute “embodie[d] the social policy of the state” which recognized that firemen are subjected to certain hazards which could cause heart disease. Id. at 440. Therefore, the statutory presumption was intended to shift the burden of proof/persuasion, even though the statute did not expressly so state. The court reasoned that the presumption would be meaningless and would negate the statutory language if it simply vanished following testimony from the employer’s expert regarding causation. Id. at 440-41.
Similar public policy considerations are evident in this case. In 2004, in response to the increase in sinkhole claims and policy cancellations, the Florida Legislature commissioned a study by Florida State University on matters related to the affordability and availability of sinkhole insurance. See Fla. S. Banking & Ins. Comm., CS for SB 1488 (2005) Staff Analysis 18 (Apr. 7, 2005) (on file with comm.) [hereinafter SB 1488 Staff Analysis]. The study found that sinkhole claims had dramatically increased in a five-year period, from 348 in 1999 to 1108 in 2003, and that payments for sinkhole claims had almost tripled, from $22.4 million in 1999 to $65 million in 2003. Id. As a result of the increase in sinkhole claims and the high costs associated with investigating those claims, many private insurers withdrew from Florida, forcing residents to obtain property insurance through Citizens Property Insurance Company, Florida’s insurer of last resort. Cassandra R. Cole, Ph. D., et al., Potential Solutions to the Sinkhole Problem in Florida, CPCU eJOUR-NAL (CPCU Society, Malvern, PA), Dec. 2005, at 2. This situation resulted in substantial rate increases for Citizens’ policyholders in sinkhole-prone counties. Id. at *142 2. The 2005 study made several recommendations to address the “sinkhole problem.” Id. at 1. These recommendations included creating uniform procedures for adjusting sinkhole claims utilizing experts and establishing a database with sinkhole claims information. Id. The study recognized the high cost of sinkhole testing[8] and the fact that accurate testing requires a certain level of “geotechnical expertise.” Id. at 3. One of the problems with sinkhole testing was the lack of standardized methods for identifying sinkholes, which caused a large number of disputed claims. Id. The 2005 report recommended the creation of a uniform approach to identify sinkholes, in an effort to “provide consistency in claims handling” and a reduction in the number of disputed sinkhole claims. Id. at 4. It was obvious, based upon the study, that a collapse of the sinkhole insurance market was imminent without legislative reform. Against this critical economic background, the legislature revised the statutes at issue in this case “in response to a continuing crisis regarding the availability and affordability of sinkhole coverage.” Fla. S. Banking & Ins. Comm., CS for SB 286 (2006) Staff Analysis 3 (Apr. 11, 2006) (on file with comm.).
Specifically, section 627.707, Florida Statutes (2005), was amended to revise the standards for investigating sinkhole claims. See SB 1488 Staff Analysis at 24. Section 627.707(2) requires an insurer who receives a sinkhole claim to engage an engineer or professional geologist to conduct testing as set forth in section 627.7072, to determine the cause of loss. Section 627.7072 sets forth specific standards to test for the presence or absence of sinkholes. The testing must conform to the Florida Geological Survey Special Publication No. 57 (2005). § 627.7072(2). Section 627.707(2) then requires that a report be issued as provided in section 627.7073. Id. Section 627.7073 specifies what must be included in that report. Section 627.7073(l)(c) then clearly states:
The respective findings, opinions, and recommendations of the engineer and professional geologist as to the verification or elimination of a sinkhole loss and the findings, opinions, and recommendations of the engineer as to land and building stabilization and foundation repair shall be presumed correct.
(Emphasis added.) As in Caldwell, it is clear that these statutory sections were enacted with a common social policy: to address the critical sinkhole insurance problem in Florida. Presumptions based on social policy are not “vanishing” presumptions; they do not automatically disappear. See Caldwell, 372 So.2d at 440. Rather, they are presumptions shifting the burden of proof. Id. (holding that presumption could be overcome only by clear and convincing evidence and that, in the absence of such cogent proof, public policy must be given effect). The majority points out that the legislature knows how to expressly create burden-shifting presumptions under section 90.304. While this may be true, as illustrated by Caldwell, the fact that the statute does not expressly state that it contains a burden-shifting presumption is not always dispositive of the issue.
In fact, this case illustrates why section 627.7073’s presumption ought to be a burden-shifting presumption. Upon receiving Mr. Warfel’s claim, Universal hired experts whose qualifications met the requirements of the relevant statute and had those experts conduct the type of testing required by the statute. The experts then prepared a report as required by section 627.7073. This was all done at Universal’s expense. At trial Mr. Warfel offered his own experts, who simply reviewed Univer *143 sal’s report and visited the property; they did not conduct independent testing consistent with the standards set forth in section 627.7072. Mr. Warfel’s experts then simply disagreed with the report’s conclusions and opined that a sinkhole contributed to the damage to Mr. Warfel’s property. To apply a “vanishing” presumption under these facts effectively negates the presumption of correctness conferred upon the report by section 627.7073(l)(c). It is inconceivable that the legislature would enact a statute containing extensive detail regarding sinkhole testing and expert reports and that it would express its intent that the report “be presumed correct,” only to have this presumption “vanish” when an expert hired by the insured simply testifies that he disagrees with the conclusions contained in the report. Allowing Mr. War-fel’s experts to “vanish” the presumption created by the statute by simply testifying that they disagree with the report negates the statute’s efforts to provide consistency in claims handling and reduce the number of disputed sinkhole claims. This type of ipse dixit logic from the insured’s experts is not consistent with the history and intent of the statute.

. In 2005, the cost of testing for sinkhole losses ranged from $4000 to $8000 and higher. Cassandra R. Cole, Ph.D., et. al., supra at 3.